IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 21-00099 SOM |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT'S |
| | ) | MOTION FOR CONTINUED RELEASE |
| | ) | PENDING APPEAL |
| | ) | |
| vs. | ) | |
| | ) | |
| FELIX THAXTON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANT'S MOTION
FOR CONTINUED RELEASE PENDING APPEAL**

**I.      INTRODUCTION.**

Defendant Felix Thaxton entered a plea of guilty to Count 1 of the Indictment (possession of 50 grams or more of methamphetamine with intent to distribute) pursuant to a Memorandum of Plea Agreement in which he waived his right to appeal his sentence and conviction with limited exceptions.  He acknowledged his understanding of that waiver.  *See* Transcript of Proceeding (Change of Plea Hearing on Apr. 6, 2023), ECF No. 114, PageID #s 144-45; Memorandum of Plea Agreement (Apr. 6, 2013), ECF No. 71.

Thaxton, who is not presently detained, was sentenced to a below-guideline sentence of 108 months in custody, and a date has been set by which he must report to begin serving his sentence.  He now moves for release pending appeal.  His motion contends that the appeal waiver in his plea agreement has been

rendered unenforceable by this court's statement at sentencing that the sentence was appealable and that he had fourteen days in which to file his appeal.  He further argues that, relieved of the appeal waiver, he raises substantial questions about this court's application of sentencing enhancements.  This court denies the motion.

Thaxton must report to his designated facility to begin serving his sentence.  The court extends the previously set deadline of April 8, 2024, to 10:00 a.m. on April 22, 2024.  This extension is to allow Thaxton to complete a medical procedure and consult with his doctor(s) on matters Thaxton has recently notified the court about.

## II.    BACKGROUND.

Paragraph 13 of Thaxton's Memorandum of Plea Agreement filed on April 6, 2023, states:

> 13.  The defendant is aware that he has the right to appeal his conviction and the sentence imposed.  The defendant knowingly and voluntarily waives the right to appeal, except as indicated in subparagraph "b" below, his conviction and any sentence within the Guidelines range as determined by the Court at the time of sentencing, and any lawful restitution or forfeiture order imposed, or the manner in which the sentence, restitution, or forfeiture order was determined, on any ground whatsoever, in exchange for the concessions made by the prosecution in this Agreement.  The defendant understands that this waiver includes the right to assert any and all legally waivable claims.

2

> a.  The defendant also waives the right to challenge his conviction or sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255, except that the defendant may make such a challenge (1) as indicated in subparagraph "b" below, or (2) based on a claim of ineffective assistance of counsel.

> b.  If the Court imposes a sentence greater than specified in the guideline range determined by the Court to be applicable to the defendant, the defendant retains the right to appeal the portion of his sentence greater than specified in that guideline range and the manner in which that portion was determined and to challenge that portion of his sentence in a collateral attack.

ECF No. 71, PageID # 644-45.

During the change of plea hearing held on April 6, 2023, the Government summarized the appeal waiver in the plea agreement:

> Paragraph 13 contains an appellate waiver. In that waiver, the defendant agrees to waive all legally waivable appeals and collateral consequences upon his conviction except for two circumstances: first, in the case of a claim of ineffective assistance of counsel, and second, in the event that the defendant is sentenced above the guidelines, the defendant retains the ability to challenge the portion of his sentence that is greater than the guidelines.

ECF No. 114, PageID #s 140-41.  This judge then asked Thaxton whether that summary of the plea agreement was consistent with what he had agreed to.  He indicated that it was consistent. *Id.*, PageID # 1042.

This judge then stated that she was going to go over the "very important provisions in your plea agreement" with respect to challenging the conviction and any sentence, stating:

> So first of all, the government is keeping whatever rights it has to take an appeal, but you are agreeing that you cannot take an appeal except if I figure out what the sentencing guidelines suggest your sentence should be and I decide to give you some sentence that is worse than what the sentencing guidelines suggest.  If I do that, you can take an appeal from the portion of your sentence that is worse.
>
> . . . .
>
> You are limiting your right to appeal in the manner I've just said.  Do you understand?
>
> THE DEFENDANT: Yes, ma'am.

ECF No. 114, PageID #s 144-45.

The case later proceeded to sentencing, and there was considerable argument during the sentencing hearing about two sentencing enhancements.  Given the amount of drug Thaxton was responsible for, he had a Base Offense Level of 36.  Two points were added pursuant to USSG § 2D1.1(b)(1) because Thaxton had possessed a dangerous weapon during the commission of the drug crime ("Firearm Enhancement").  Another two points were added pursuant to USSG § 2D1.1(b)(12) because Thaxton had maintained premises for the purpose of manufacturing or distributing controlled substances ("Premises Enhancement").  Three points were subtracted for Thaxton's acceptance of responsibility and

timely guilty plea, leaving Thaxton with a Total Offense Level of 37.  Thaxton's criminal history score of zero placed him in Criminal History Category I.  *See* Presentence Investigation Report, ECF No. 91, PageID #s 924-28, 940-41.  Thaxton's guideline range was 210 to 262 months; he had a statutory minimum term of 10 years of imprisonment.  *See id.*, PageID #s 935, 943.

The Government moved for a four-level downward departure to Total Offense Level 33 based on Thaxton's substantial assistance to the Government, resulting in a guideline range of 135 to 168 months.  The Government also sought an additional variance to 120 months based on Thaxton's health issues.  *See* ECF Nos. 86, 115, PageID # 1091.  Thaxton argued at sentencing that his offense level should be further decreased by one or two levels, resulting in a sentence of 60 months.  *See* ECF No. 115, Page ID #s 1090, 1095-96.

The court granted the Government's motion for downward departure and further varied based on the record of Thaxton's substantial assistance, sentencing Thaxton to 108 months of imprisonment, 5 years of supervised release, a $100 special assessment, and forfeiture of $45,915.00.  *See* Amended Judgment in a Criminal Case, ECF No. 95.  The 108-month sentence reflects a low-end sentence in the 108 to 135 month guideline range, corresponding to a Total Offense Level of 31 and a Criminal History Category of I.

At the very end of the sentencing hearing, this judge said, "Now this is an appealable sentence, so if you are considering an appeal, keep in mind you have 14 days in which to take an appeal." ECF No. 115, PageID # 1104. This was an iteration this judge typically uses in proceedings not involving plea agreements with appeal waivers. When a plea agreement with an appeal waiver is involved, this court typically reminds the defendant that the defendant has limited appeal rights given the plea agreement, but says that if the defendant believes there is a right of appeal, the appeal must be taken within fourteen days of the filing of the judgment. Although this judge recognizes that the focus on the matter before this court in no way turns on this judge's intent, this judge states that, in using the iteration now in issue, this judge had no intention of vitiating any provision in the parties' agreement. Three days after the amended judgment was filed, Thaxton filed a notice of appeal *pro se*. *See* ECF No. 97.

Thaxton's sentencing counsel withdrew from representing him, and Thaxton, represented by substitute counsel, now moves for continued release pending appeal, arguing that he has raised substantial questions on appeal with respect to the two criminal history points he received for the Firearm Enhancement and the two criminal history points he received for the Premises Enhancement. He additionally argues that he should have received

6

an additional two-level reduction for being safety-valve eligible. Thaxton argues that with a reduction of six levels his Total Offense Level would be 25, yielding a guideline range of 57 to 71 months. Because he was sentenced to the low end of offense level 31, he argues that he should be sentenced to the low end of level 25. Noting that the court may depart downward from the reduced guideline range, Thaxton further posits that it is possible for him to receive a sentence of less that 40 months, which would be less than the combination of the time he has already served and the average length of appeal.[1]

To appeal the Firearm Enhancement and the Premises Enhancement, Thaxton must overcome the appellate waiver in his plea agreement. He argues that the waiver cannot be enforced because, at the very end of the sentencing hearing, this judge told him that the judgment was appealable. *See* ECF No. 115, PaeID # 1104.

Thaxton's motion recognizes that, even if the appeal waiver has been vitiated, his motion cannot succeed unless he

---

[1] Thaxton's concern about serving more than his ultimate sentence should he prevail on appeal relies on assumptions built on assumptions. He posits that he will prevail before the Ninth Circuit on all the issues he raises in the present motion, leading to a six-level reduction in his Total Offense Level. If he prevails on fewer than all of the issues, his Total Offense Level, of course, would not be as low. He then further posits that, on remand, this court might vary below the resulting guideline range to impose a sentence that is about two-thirds of the low end of the range.

also raises substantial questions going to the merits of his sentence.  Because Thaxton fails to raise a substantial question about those merits, this court denies his motion.  Thaxton must self-surrender by 10 a.m. on April 22, 2024, at the facility designated by the Bureau of Prisons.

III.    **ANALYSIS.**

In relevant part, Thaxton seeks his continued release pending appeal pursuant to 18 U.S.C. § 3143(b)(1), which states:

> **(b) Release or Detention Pending Appeal by the Defendant.—**
>
> **(1)** Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—
>
> **(A)** by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
>
> **(B)** that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
>
> **(i)** reversal,
>
> **(ii)** an order for a new trial,
>
> **(iii)** a sentence that does not include a term of imprisonment, or
>
> **(iv)** a reduced sentence to a term of imprisonment less than the total of

the time already served plus the expected
duration of the appeal process.

If the judicial officer makes such findings,
such judicial officer shall order the release
of the person in accordance with section
3142(b) or (c) of this title, except that in
the circumstance described in subparagraph
(B)(iv) of this paragraph, the judicial
officer shall order the detention terminated
at the expiration of the likely reduced
sentence.

A "substantial question" is one that is "fairly
debateable" or "fairly doubtful," and is one of more substance
than would be necessary to find that it was not frivolous.
*United States v. Garcia*, 340 F.3d 1013, 1021 n.5 (9th Cir. 2003);
*United States v. Montoya*, 908 F.2d 450, 450 (9th Cir. 1990);
*United States v. Wheeler*, 795 F.2d 839, 840 (9th Cir. 1986);
*United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985).
"The defendant . . . need not . . . present an appeal that will
likely be successful, only a non-frivolous issue that, if decided
in the defendant's favor, would likely result in reversal or
could satisfy one of the other conditions." *Garcia*, 340 F.3d at
1021, n.5. As Thaxton recognizes, a "substantial question" is
one that "poses issues 'debatable among jurists of reason." ECF
No. 117, PageID # 1138 (quoting *Handy*, 761 F2d at 1282). That
is, so long as reasonable jurists might differ, even a novel
issue might raise a "substantial question."

While Thaxton raises a substantial question as to
whether his appeal waiver is enforceable, he fails to persuade

this court that he has identified a substantial question of law or fact going to the merits of his sentence.  This court therefore denies his motion for release pending appeal.

> **A.    Thaxton Raises A Substantial Question With Respect to the Enforceability of His Waiver of Appellate Rights.**

While leaving to the Ninth Circuit any decision on whether the appeal waiver has been vitiated, this court recognizes that Thaxton does raise at least a substantial question as to the waiver's enforceability.  Thaxton argues that this court's statement at his sentencing hearing that he had the right to appeal, combined with the Government's silence at the time, nullified the waiver of appellate rights in his plea agreement and erased Thaxton's clear understanding of that appellate waiver at his change of plea hearing.

In *United States v. Buchanan*, 59 F.3d 914, 917 (9th Cir. 1995), the Ninth Circuit noted that a defendant may waive the statutory right to appeal his or her sentence when an express waiver is knowingly and voluntarily made.  Even when such a waiver is knowingly and voluntarily made, the waiver may be rendered unenforceable if a judge creates for the defendant a reasonable expectation that an appeal is permitted.

In *Buchanan*, the defendant had a written plea agreement containing an appeal waiver.  At sentencing the district judge advised the defendant that he had the right under Rule 32 of the

10

Federal Rules of Criminal Procedure to appeal the judge's findings.  The judge asked the defendant whether he understood that he had ten days to file an appeal.  The Ninth Circuit held that the district judge's oral pronouncements could have led Buchanan to reasonably expect that he could appeal his sentence. *Id.* at 917-18.  When Buchanan indicated his understanding that he could file a notice of appeal within ten days, he demonstrated a misunderstanding of the waiver portion of his plea agreement. The Government did not object to the court's misstatements, leaving Buchanan with no reason to doubt the court's advice on his right to appeal.  Under those circumstances, the waiver of appellate rights in his plea agreement was unenforceable.  *Id.* at 918.

In *United States v. Arias-Espinosa*, 704 F.3d 616, 618 (9ᵗʰ Cir. 2012), the Ninth Circuit, noting that a "district court's clear statement that a defendant has the right to appeal renders unenforceable the defendant's prior waiver of this right in a plea agreement," explained that, in determining whether a prior waiver is enforceable, the focus is on the court's statement(s) and the defendant's reasonable expectation about his rights.  *Id.*  In reviewing whether a waiver should be enforced, courts examine whether a judge's advice is unambiguous and without qualification.  *Id.* at 619.

The waiver of appellate rights remained enforceable in

*Arias-Espinosa* because the judge had merely told the defendant at sentencing that he "may have a right to appeal." *Id.*  The Ninth Circuit noted that the circumstances did not create confusion or a reasonable expectation of a right to appeal.  Arias-Epinosa's counsel had told him of the waiver and he had told the magistrate judge at his change of plea hearing that he understood that he was waiving his right to appeal.  704 F.3d at 619.

When the Government immediately objects to or corrects the judge's statement about an appeal right, no reasonable expectation of a right to appeal is created.  *See United States v. Felix*, 561 F.3d 1026 (9th Cir. 2009).

In short, a waiver of appellate rights becomes unenforceable when a judge makes an unambiguous statement that creates a reasonable expectation that a defendant has a right to appeal.  *See United States v. Macias*, 2022 WL 501135, *1 (9th Cir. Feb. 18, 2022) (ruling waiver unenforceable when district judge advised defendant that he had right to appeal); *United States v. Baptista*, 738 Fed. App'x 384, 386 (9th Cir. 2018) (ruling waiver unenforceable when court told defendant, "If you wish to appeal, you must do so withing 14–within days.") (unpublished disposition).  *See also United States v. Zink*, 107 F.3d 716, 718 (9th Cir. 1997) (ruling waiver unenforceable if judge advises defendant of right to appeal, Government does not object, and Rule 11 plea colloquy failed to advise defendant

12

about waiver of appeal).

The Ninth Circuit has also declined to enforce an appellate waiver when a judge tells a defendant at a change of plea hearing that he may appeal his sentence if it is contrary to law. *See United States v. Saleh*, 167 Fed. App'x 656, 657 (9th Cir. 2006) (unpublished disposition).

On the other hand, waivers of appellate rights have been enforced when a court's statements are ambiguous or ambivalent such that no reasonable expectation of a right to appeal was created. *See United States v. Watson*, 582 F3d 974, 987-88 (9th Cir. 2009). In *United States v. Aguilar-Muniz*, 156 F.3d 974, 977 (9th Cir. 1998), the Ninth Circuit similarly concluded that an appellate waiver was enforceable when the court told the defendant at sentencing that he had waived his appellate rights as part of his plea agreement, but "if you believe the waiver is unenforceable, you can present that theory to the appellate court."

Thaxton contends that the terms of his plea agreement, this court's statements at his plea hearing, and his own acknowledgment of his waiver of appellate rights at the plea hearing have been nullified because this court's statement at sentencing and the absence of a Government objection to this court's sentencing statement raised in him a reasonable expectation that he could appeal his sentence. He has objected

13

to the holding of an evidentiary hearing going to his expectation
and his actual state of mind.  On the present motion, this court
need only decide whether Thaxton raises a substantial question on
this issue.  He does.

> **B.    Thaxton Raises No Substantial Question With
>        Respect to Either the Application of the Firearm
>        Enhancement or the Safety Valve.**

While raising a substantial question as to the appeal
waiver, Thaxton does not similarly raise a substantial question
as to the Firearm Enhancement or the safety valve.

For violations of 21 U.S.C. § 841(a), the statute under
which Thaxton was convicted, *see* ECF No. 95, PageID # 966
(Amended Judgment in a Criminal Case), USSG § 2D1.1 applies.  In
relevant part, an offense level is increased by two levels when
"a dangerous weapon (including a firearm) was possessed."  USSG
§ 2D1.1(b)(1).  Comment 11(A) to that section states:

> The enhancement for weapon possession in
> subsection (b)(1) reflects the increased
> danger of violence when drug traffickers
> possess weapons.  The enhancement should be
> applied if the weapon was present, **unless it
> is clearly improbable that the weapon was
> connected with the offense**.  For example, the
> enhancement would not be applied if the
> defendant, arrested at the defendant's
> residence, had an unloaded hunting rifle in
> the closet.

*Id.* (emphasis added).

Thaxton received a two-level increase for having a
handgun in connection with his drug offense.  According to his

Memorandum of Plea Agreement, on or about June 11, 2021,
investigators executed a federal search warrant of the
condominium unit Thaxton was renting, seizing over 500 grams of
heroin, over 1700 grams of methamphetamine, cocaine, and $45,915
in U.S. currency.  The investigators also found a "privately-
made, glock-style handgun" and a disassembled shotgun, along with
ammunition.  *See* ECF No. 71, PageID # 641.  According to the PSR
and the factual stipulations in Thaxton's Memorandum of Plea
Agreement, the handgun and ammunition were found in a desk drawer
in which Thaxton's driver's license was also found.  *See* ECF No.
91, PageID # 926; ECF No. 71, PageID # 641.

        At the time the unit was searched, another individual,
Robert Branco, was present.  *See* ECF No. 91, PageID # 940.  At
the sentencing hearing, the Government indicated that the seized
disassembled shotgun was in a backpack containing a bag with
Branco's identification.  The Government did not argue that
Thaxton should be responsible for a firearm enhancement based on
the shotgun.  *See* ECF No. 115, PageID # 1066.

        With respect to the handgun, the Government argued that
Thaxton was the sole registered occupant of the one-bedroom unit
and that the handgun was found in a desk drawer containing
Thaxton's wallet, which held his identification, including his
driver's license, VA health insurance card, and card to access
the Navy Exchange.  *Id.*, PageID #s 1066-67.  Thaxton admitted

15

during his change of plea hearing that the handgun was found in a desk drawer. *See* ECF No. 114, PageID # 1054. Finally, there is a recorded statement of Thaxton in which he told a cooperating witness that, if people came at him, they were going to be shot. *See* ECF No. 115, PageID # 1067.

With respect to the Firearm Enhancement, the Ninth Circuit has noted that the burden is on the Government to prove the defendant's possession of a dangerous weapon by a preponderance of the evidence. *See United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir. 1997). Once the Government meets its preponderance burden, "[t]he two-level sentencing adjustment is appropriate 'unless it is clearly improbable that the weapon was connected with the offense.'" *United States v. Boykin*, 785 F.3d 1352, 1364 (9th Cir. 2015). In *United States v. Nelson*, 222 F.3d 545, 549 (9th Cir. 2000), the Ninth Circuit explains how the preponderance and clearly improbable standards fit together:

> In this circuit, once the government demonstrates that a defendant possessed a dangerous weapon, to avoid a sentence enhancement under § 2D1.1(b)(1), the burden of proof is on the defendant to prove that it is "clearly improbable" that he possessed a weapon in connection with the offense.

*Id.*

*United States v. Kelso*, 942 F.2d 680 (9th Cir. 1991), is instructive on possession, the first part of the two-point Firearm Enhancement analysis. In that case, border agents pulled

16

over a truck driven by Kelso's codefendant.  Noticing that the truck's ignition switch had been removed and that the defendants seemed nervous, the agents asked the codefendant for permission to search the truck.  Behind the driver's seat, agents found a bag containing methamphetamine, a handgun, and ammunition.  Both defendants admitted to knowing about the drugs, but both denied knowledge of the handgun.  *Id.* at 681.  The district court added two levels to Kelso's offense level given the Firearms Enhancement.  On appeal, Kelso argued that the two-level enhancement was improper because he had not possessed the gun (even though there was no question that a firearm was present during the commission of the underlying offense).

The Ninth Circuit held that, to demonstrate constructive possession:

> the government must prove "a sufficient connection between the defendant and the contraband to support the inference that the defendant exercised dominion and control over the substance."  *United States v. Disla*, 805 F.2d 1340, 1350 (9th Cir.1986).  It is not the same as merely knowing the weapon is nearby.  "The circumstances of each case must be examined to determine if there is 'such a nexus or relationship between the defendant and the goods that it is reasonable to treat the extent of the defendant's dominion and control as if it were actual possession.'"  *United States v. Cousins*, 427 F.2d 382, 384 (9th Cir. 1970) (quoting *United States v. Casalinuovo*, 350 F.2d 207, 209-11 (2nd Cir. 1965)).

*Id.* at 682.  *Kelso* held that there was insufficient evidence to

demonstrate that Kelso had constructive possession of the weapon, as there was no evidence of "dominion and control" over the weapon.  *Id.*

In *Cazares*, the Ninth Circuit noted that *Kelso*'s reasoning applies to occupants of a house, stating that, when a residence is jointly occupied, the mere fact that contraband is discovered at a residence, without more, does not provide sufficient evidence of constructive possession with respect to any of the occupants of the residence.  *See* 121 F.3d at 1245.

This is not a case in which there was nothing more than discovery of contraband in jointly occupied premises.  While Branco was present in the unit when the search warrant was executed, nothing in the record suggests that he was anything more than a visitor.  The registered occupant was Thaxton, and only Thaxton.  *See* ECF No. 115, PageID # 1065.  The handgun and ammunition were found in a desk drawer containing Thaxton's wallet and identification.  This amounts to a preponderance of the evidence establishing that Thaxton had constructive possession of the handgun, that is, that he had dominion and control over what was in a drawer in the unit he alone occupied. The gun was in the same unit as the drugs, and Thaxton was distributing drugs from the unit.  Moreover, Thaxton was heard saying that he would shoot anyone who came at him.  Nothing in the record suggests any reason other than drug dealing that might

18

have caused Thaxton to posit that people would come at him.

Thaxton could have negated application of the Firearm Enhancement had he established the second prong of the Firearm Enhancement analysis–that it was clearly improbable that the handgun was connected with the drug offense.  At the sentencing hearing, this court asked Thaxton's counsel whether an evidentiary hearing was being requested.  Thaxton's sentencing attorney responded, "Your Honor, the defense is not requesting an evidentiary hearing. . . . [W]e both agree the decision comes down to an interpretation of the facts . . . ."  ECF No. 115, Page ID# 1061-62.  Counsel informed the court that "we are not necessarily objecting to any of the facts that are in the presentence investigation" and said that "the Court could rely on just on the interpretation of them."  *Id.*

Thaxton's counsel argued that there was no evidence as to when things had been placed in the drawer, and also questioned the credibility of the cooperating witness.  *Id.* at 1064-65.  This did not amount to a showing that it was clearly improbable that the handgun was connected to the drug offense.  It is not entirely clear to this court whether Thaxton is claiming to raise a substantial question as to the Firearm Enhancement, but if he is, this court is not persuaded on that matter.  It is not fairly debatable that the Government met its burden of establishing Thaxton's possession of the handgun by a preponderance of the

19

evidence and that Thaxton failed to show that it was clearly improbable that the handgun was connected to the drug offense. *See Boykin*, 785 F.3d at 1364; USSG § 2D1.1, cmt 11(A).

Thaxton articulates the separate argument that, even if the Firearm Enhancement was correctly applied, he raises a substantial question about being safety-valve eligible under USSG § 5C1.2.  One of the things a defendant must show for such eligibility is that the defendant did not possess a firearm or other dangerous weapon in connection with the offense.  *See* USSG § 5C1.2(a)(2).  The burden is on a defendant to prove eligibility for safety valve under USSG § 5C1.2.

Thaxton notes that, in applying the Firearm Enhancement, this court had to determine whether Thaxton had met his burden of showing that it was clearly improbable that the handgun and the drug offense were connected, whereas with respect to safety-valve eligibility, Thaxton had the lower burden of establishing eligibility by a preponderance of the evidence.  As the Ninth Circuit said in *United States v. Nelson*, 222 F.3d 545, 551 (9th Cir. 2000), "For purposes of § 5C1.2, therefore, we hold that, even where a defendant has already received a § 2D1.1 enhancement, the defendant need only show his eligibility for [safety valve] relief by a preponderance of the evidence." Thaxton contends that this court failed to address this lower standard in the context of the safety valve.

20

The attorney who represented Thaxton during sentencing had noted in the course of discussing the Firearm Enhancement that "if the Court agrees with the defense's interpretation of the evidence, Mr. Thaxton would be eligible as a zero point offender. That I did not put in my pleadings." ECF No. 115, Page ID# 1065.

While the burdens are different under USSG § 2D1.1(b)(1) and USSG § 5C1.2, the Ninth Circuit has stated that "**conduct** which warrants an increase in sentence under § 2D1.1(b)(1) necessarily defeats application of the safety valve." *United States v. Smith*, 175 F.3d 1147, 1149 (9th Cir. 1999) (emphasis added). Thaxton's conduct involved constructive possession of a gun and ammunition in the same unit from which Thaxton was dealing drugs. That gun was found in a desk drawer containing Thaxton's wallet and identification. Thaxton had asserted that he would shoot anyone who came after him. He declined at his sentencing hearing to present any evidence negating these facts.

In applying the Firearm Enhancement, this court necessarily found that Thaxton possessed the handgun. That is, the Government met its burden of establishing his possession by a preponderance of the evidence under the two-step process applicable to that enhancement. Had the Government not met its preponderance burden, the clearly improbable burden would not

21

have arisen.  The Government's meeting of its preponderance burden with respect to the Firearm Enhancement means that Thaxton cannot show by a preponderance of the evidence that he did not at least possess the handgun.  If the Government proves a matter by a preponderance, a defendant cannot also prove the opposite by a preponderance.  Because Thaxton's gun possession is established for safety-valve purposes given the Government's preponderance evidence in the Firearm Enhancement context, only the question of whether the gun was possessed in connection with the drug offense remains for safety-valve purposes.  Jurists of reason would not debate Thaxton's failure to meet his burden of showing by a preponderance of the evidence that he did not possess a firearm in connection with the offense.  *See* USSG § 5C1.2(a)(2).  Having declined an evidentiary hearing, Thaxton is left with the existing factual record on this point.

This court notes that, at the end of the portion of the sentencing hearing addressing the guideline calculation, the court asked, "Are there remaining objections that are not taken care of by my weapons enhancement and the premises maintained for drug distribution enhancement?"  Thaxton's counsel noted a misspelling of a name in the PSR, which this court ordered corrected.  This court then asked, "Other than that?"  Thaxton's counsel answered, "No, Your Honor."  Thaxton's sentencing counsel thus appears to this court to have concluded at that time that

the safety-valve issue had been taken care of given the nature of this court's view of the evidence and conduct relating to the Firearm Enhancement.  This view was correct.  While this court did not expressly state on the record that Thaxton failed to meet his preponderance burden as to safety-valve eligibility, this court cannot say that Thaxton raises a substantial question going to whether there was a preponderance of the evidence establishing the absence of a connection between the firearm and the drug offense.

> **C.  Thaxton Raises No Substantial Question With Respect to Whether the Premises Enhancement Applied.**

Thaxton contends that there is a substantial question going to the application of the Premises Enhancement.  Under USSG § 2D1.1(b)(12), two levels are added to a defendant's offense level when "the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance."  Application Note 17 to USSG § 2D1.1(b)(12) explains:

> Subsection (b)(12) applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution.
>
> Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant

23

> controlled access to, or activities at, the
> premises.
>
> **Manufacturing or distributing a controlled**
> **substance need not be the sole purpose for**
> **which the premises was maintained, but must**
> **be one of the defendant's primary or**
> **principal uses for the premises, rather than**
> **one of the defendant's incidental or**
> **collateral uses for the premises.**  In making
> this determination, the court should consider
> how frequently the premises was used by the
> defendant for manufacturing or distributing a
> controlled substance and how frequently the
> premises was used by the defendant for lawful
> purposes.

*Id.* (emphasis added).  In other words, the sentencing guidelines

only require drug use to be one of the primary purposes, not the

sole or main purpose.

Without citing any authority other than § 2D1.1(b)(12),

Thaxton argues that this court should have conducted a

"frequency-of-use" analysis, comparing Thaxton's lawful use of

the premises for residential purposes with his unlawful use.

Case law has rejected that approach.  Instead, appellate courts

that have examined the Premises Enhancement have concluded that

it applies even when a defendant uses the premises as a home.

In *United States v. Miller*, 698 F.3d 699 (8th Cir.

2012), for example, the Eighth Circuit rejected a defendant's

claim that she was primarily using the house in question to raise

eleven children and that, under the Application Note's frequency

analysis, she should not have received the Premises Enhancement.

24

The Eighth Circuit noted that, in the Fair Sentencing Act of 2010, Pub. L. 111-220, § 6(2) (Aug. 3, 2010), Congress directed the Sentencing Commission to adopt what became § 2D1.1(b)(12). Specifically, that congressional directive sought a guideline that added two offense levels when "the defendant maintained an establishment for the manufacture or distribution of a controlled substance"). *Id.* at 707. In so doing, Congress "surely intended to deter the manufacture and distribution of illegal drugs in 'crack houses' where children are being raised." *Id.* Thus, the Eighth Circuit said it was "somewhat baffled" by the Application Note's direction to compare the frequency of lawful and unlawful uses. Ultimately, the Eighth Circuit ruled that "§ 2D1.1(b)(12) applies when a defendant uses the premises for the purpose of substantial drug-trafficking activities, even if the premises was also her family home at the times in question." *Id.*

In *United States v. Hopper*, 934 F.3d 740 (7th Cir. 2019), the Seventh Circuit similarly faced a challenge to an enhancement under § 2D1.1(b)(12). When the court examined Application Note 17, it focused on its language that "Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." The defendant in *Hopper* used

the premises as a home, and the Seventh Circuit stated that its review was limited to whether distributing methamphetamine was a "primary or principal" use of the home. *Id.* at 763. In making that determination, the Seventh Circuit stated that "courts are not required to apply a simple balancing test that compares the frequency of unlawful activity at the residence with the frequency of lawful uses." *Id.* Such a test would immunize every family home used for drug distribution because lawful use of a home "is all but certain to exceed the amount of illegal activity." *Id.* Instead, district courts "should focus on both the frequency and significance of the illicit activities" to determine whether a prohibited use can fairly be described as a "primary or principal use." *Id.* "Factors relevant to this analysis include quantities dealt, customer interactions, keeping tools of the trade and business records, and accepting payment." *Id.* at 763-64 (quotation marks and citation omitted).

In *United States v. Bell*, 766 F.3d 2014 (6th Cir. 2014), the Sixth Circuit similarly rejected an argument that the Premises Enhancement should not apply when a defendant lives full-time at a house, noting that an individual may both live and manufacture drugs in a residence. "No case to our knowledge has held that the statute does not apply to residences, where the activity of living there will invariably be the main, but not the only, purpose of the premises. Court after court has applied the

statute to drug production and distribution at residences." *Id.* at 638. The court stated that the Application Note only requires drug activity to constitute one of the primary or principal purposes, not the sole purpose. *Id.*

Thaxton's PSR noted that a confidential source had reported that Thaxton stored kilograms of methamphetamine in an ice box in his unit and that he also "cut" the methamphetamine there. Thaxton was listed as the occupant of that unit. On June 9, 2021, Thaxton sold 12 grams of heroin to the confidential source out of the unit. *See* ECF No. 91, PageID # 922. A search of the premises yielded 1,702 grams of methamphetamine, 584 grams of heroin, suspected cocaine, $45,915 in cash, and a handgun and ammunition in a desk drawer containing Thaxton's wallet and identification. *Id.*, PageID # 923. Thaxton's Memorandum of Plea agreement stipulates that he sold the 12 grams of heroin out of his unit to the confidential source on June 9, 2021. *See* ECF No. 71, PageID # 641. The Government argued that Thaxton had moved to the unit in early 2021 because he wanted to keep his criminal activities away from his son, who lived at a separate reidence in Wahiawa. Even were this court to disregard Thaxton's original motive for renting the downtown unit, the record would amply support the conclusion that a primary or principal use by Thaxton of the unit was drug dealing. Admittedly, Thaxton also regularly slept in the unit, but that does not negate application of the

Premises Enhancement. *See United States v. Jones*, 583 F. App'x 694, 696–97 (9th Cir. 2014), as amended (Aug. 15, 2014) (affirming application of U.S.S.G. § 2D1.1(b)(12) "in light of the three documented sales of drugs by Jones at his home, the large amounts of cash found in the house, drug manufacturing residue found in the kitchen drain, and the PSR's finding that Jones had no other gainful employment").

Notably, while Application Note 17 does say that a court should consider "how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes," this consideration is viewed as being in aid of "making this determination" [as to whether drug distribution was "one of the defendant's primary or principal uses for the premises, rather than one of the defendant's initial or collateral uses for the premises"].  The record establishes that Thaxton stored and cut drugs at the unit, as well as kept drug proceeds in the unit.  The storage of drugs in the refrigerator suggests that the storage was not momentary, as would be the case if distribution of all the drugs occurred immediately after the drugs reached Thaxton's unit.  Drugs may have been stored there even during some of the times Thaxton was sleeping there.  The quantity of drugs was significant, and there was customer interaction at the unit.  Thaxton's contention that

28

this court erred in failing to measure the frequency of drug dealing against the frequency of lawful use of the premises assumes that this court's task was to find the primary use of the premises.  That was not this court's task.  Instead, this court had to determine whether drug dealing was one of the primary or principal purposes.  The court so found, relying on the record, which had sufficient evidence of the extent of the use to support that finding.  Especially given the appellate decisions addressing the very frequency argument Thaxton makes, this court concludes that jurists of reason would not find it fairly debatable that the Premises Enhancement applied here.

**IV.      CONCLUSION.**

Thaxton's request for continued release pending disposition of his appeal is denied, but the date by which he must report to begin serving his sentence is extended to April 22, 2024, at 10:00 a.m.

It is so ordered.

DATED: Honolulu, Hawaii, March 28, 2024.



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge

*United States v. Thaxton*, Cr. No. 21-00099 SOM; ORDER DENYING DEFENDANT'S MOTION FOR CONTINUED RELEASE PENDING APPEAL